IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| BARRY JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17 CV 1380 |
| | ) | |
| v. | ) | Hon. Sue E. Myerscough |
| | ) | District Judge |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| ANDREW TILDEN, STEPHEN RITZ, | ) | JURY TRIAL DEMANDED |
| MARY GRENNAN, MICHAEL | ) | |
| MELVIN, | ) | |
| | ) | |
| Defendants. | | |

## SECOND AMENDED COMPLAINT

Plaintiff Barry Johnson, by and through his attorneys, Loevy & Loevy, complains of Defendants Wexford Health Sources, Inc., Andrew Tilden, Stephen Ritz, Mary Ellen Grennan, and Michael Melvin, states as follows:

### Introduction

1.  Mr. Johnson, a diabetic, injured the big toe on his left foot in January 2016. Despite repeated requests for medical attention, a month lapsed before Mr. Johnson's toe was examined by a doctor—long enough for him to develop gangrene. Despite knowing of his obvious need for help, Defendants ignored him and refused to provide him care, going so far as to overrule a hospital emergency room's advice to admit him for care. As a result, all of the toes on his left foot were eventually amputated.

2.  About six months after losing the toes on his left foot, Mr. Johnson noticed that the second toe on his right foot was showing signs of infection and

1

sought medical attention. Defendants again failed to provide him with timely and adequate treatment. One month later, that toe was also amputated.

## Jurisdiction and Venue

3. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

4. Venue is proper under 28 U.S.C. § 1391(b). On information and belief, one or more Defendants reside in the judicial district, and a substantial portion of the events giving rise to the claims asserted herein occurred within this district.

## Parties

5. Plaintiff Barry Johnson is in the custody of the Illinois Department of Corrections (IDOC). At all times relevant to the events at issue in this case, Mr. Johnson was housed at Pontiac Correctional Center (Pontiac).

6. Defendant Wexford Health Sources, Inc. (Wexford) is a corporation headquartered in Pennsylvania transacting business in Illinois. Wexford, pursuant to a contract with the State of Illinois, is a healthcare provider for IDOC prisons throughout the State. At all times relevant to the events at issue in this case, Wexford was responsible for the implementation, oversight, and supervision of policies and practices at Pontiac and the IDOC generally. As an agent of the IDOC, Wexford was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including the individual Defendants Andrew Tilden and Stephen Ritz and other unknown healthcare employees at Pontiac.

7. At all times relevant to his involvement in this case, Defendant Andrew Tilden was the medical director at Pontiac, an employee of and final policymaker for Wexford, and was responsible for the implementation, oversight, and supervision of policies and practices at Pontiac. Defendant Tilden is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Tilden was acting under color of law and within the scope of his employment with Wexford.

8. At all times relevant to this case, Defendant Stephen Ritz was a Utilization Management Physician, an employee of and final policymaker for Wexford, and was responsible for the implementation, oversight, and supervision of policies and practices at Pontiac. Defendant Ritz is sued here in his individual capacity. At all times relevant to the events at issue in the case, Defendant Ritz was acting under color of law and within the scope of his employment with Wexford.

9. At all times relevant to her involvement in this case, Defendant Mary Ellen Grennan was the Health Care Unit Administrator at Pontiac, an employee of the IDOC, and was responsible for the implementation, oversight, and supervision of policies and practices at Pontiac. Defendant Grennan is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Grennan was acting under color of law and within the scope of her employment with the IDOC.

10. At all times relevant to his involvement in this case, Defendant Michael Melvin was the Warden at Pontiac, an employee of the IDOC, and was

responsible for the implementation, oversight, and supervision of policies and practices at Pontiac. Defendant Melvin is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Melvin was acting under color of law and within the scope of his employment with the IDOC.

## Facts

11. Barry Johnson is a 75-year old insulin-dependent diabetic. Since he was first incarcerated in 1992, the only healthcare accessible to Mr. Johnson has been that provided by the IDOC and its agents.

12. In the middle of January 2016, Mr. Johnson accidentally cut the big toe of his left foot. Aware of the heightened risk of complications that diabetics face when they sustain injuries to their extremities, Mr. Johnson closely monitored his foot for signs of infection.

13. In the days after the initial injury, Mr. Johnson became concerned because the wound continued to bleed. Over the course of two weeks, he submitted repeated requests (sick call slips) for medical attention for his foot, all of which went unanswered.

14. About two weeks after he injured his toe, Mr. Johnson was seen at Pontiac's Health Care Unit (HCU), but not for his toe. Instead, he went for a follow-up appointment for an unrelated, ongoing issue with his back. Because this was the first opportunity he had to speak to an HCU physician since he injured his toe, he removed his shoe and sock and asked Defendant Tilden to examine his foot. Defendant Tilden refused. He ordered Mr. Johnson to put his shoe and sock back on

and informed Mr. Johnson that he would not examine his toe since Mr. Johnson was there for his back.

15. Over the next couple of weeks, the condition of Mr. Johnson's toe continued to deteriorate, darkening and emitting a foul odor. He continued to request medical attention for his toe.

16. About two more weeks passed before Defendant Tilden finally examined Mr. Johnson's toe and concluded that it appeared infected. Defendant Tilden's treatment plan consisted of regular bandage changes with antibiotic ointment.

17. On or about February 18, 2016, Defendant Tilden determined that treatment at a specialized wound care clinic was necessary and submitted a request to have Mr. Johnson sent to one. Defendant Tilden took no further action to ensure that such treatment was made available to Mr. Johnson.

18. Two weeks after Defendant Tilden submitted the request to send Mr. Johnson to a specialized wound care clinic, Defendant Ritz denied that request.

19. While the request for treatment by an outside provider was pending, Mr. Johnson's condition continued to worsen. His toe became increasingly—and obviously—necrotic and gangrenous.

20. Mr. Johnson was seen by HCU staff approximately every other day to have his bandage changed and ointment applied. Each time he encountered an HCU staff member (including Defendants Tilden and Grennan), Mr. Johnson expressed his fear that his condition was worsening, that the treatment he was

5

receiving was not working, and that he was at risk of losing his toe or worse. No one offered anything more than antibiotic ointment and bandages.

21.  From shortly after he first injured his toe until early March, Mr. Johnson had multiple conversations with Defendant Melvin during which he informed Defendant Melvin of the inadequacy of the medical treatment he was receiving for his toe. Defendant Melvin took no action in response.

22.  On March 4, 2016, Mr. Johnson was sent to the emergency department at a nearby hospital for evaluation and treatment of his toe. The doctors there wanted to admit Mr. Johnson to the hospital for inpatient treatment, but Defendants Tilden and Grennan refused to authorize his admission without an proper basis. They caused Mr. Johnson to be released from the hospital and returned to the prison on March 5, 2016.

23.  In the days following Tilden's and Grennan's decision to force Mr. Johnson's premature release from the hospital, Mr. Johnsons' toe continued to rot, and he began to experience nausea and vomiting.

24.  On March 9, 2016, Mr. Johnson returned to the HCU to have his bandage changed. When it was removed, the stench emanating from his toe saturated the entire HCU. Mr. Johnson was returned to the emergency department.

25.  Shortly after arriving at the emergency department on March 9, 2016, Mr. Johnson was admitted to the hospital. Two days later, Mr. Johnson's left big toe was amputated. By the end of the month, all of the toes on Mr. Johnson's left foot were amputated.

26.     In October 2016, Mr. Johnson noticed that a toe on his right foot was beginning to show signs of disease similar to what he had observed with his left big toe months before. Despite his efforts to get medical attention, Mr. Johnson was provided with inadequate medical care. As a result, he underwent the amputation of the second toe on his right foot about one month after he first noticed a problem.

27.     If Defendants had provided appropriate and timely medical care, Mr. Johnson would not have had needed to have his toes amputated. Because of Defendants' failures, Mr. Johnson endured weeks of unnecessary pain and has been left permanently disfigured and with limited mobility.

## COUNT I
## 42 U.S.C. § 1983 – Denial of Medical Care (Eighth Amendment)
## All Defendants

28.     Plaintiff incorporates each paragraph of this Second Amended Complaint as if fully restated here.

29.     As described more fully above, Defendants had notice of Mr. Johnson's medical needs and the seriousness of his medical needs, and knew the risk of harm to Mr. Johnson if he did not receive appropriate medical care. Despite that knowledge, Defendants failed to provide him with any proper medical care or access to medical care, in violation of the Eighth Amendment to the United States Constitution.

30.     As a result of Defendants' unjustified and unconstitutional conduct, Mr. Johnson experienced pain, suffering, emotional distress, and injury.

7

31.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Johnson's rights.

32.     Alternatively, Defendants were deliberately indifferent to Mr. Johnson's objectively serious medical needs, and their actions were undertaken intentionally, with malice, and/or with reckless indifference to Mr. Johnson's rights.

33.     Mr. Johnson's injuries were proximately caused by policies and practices of Defendants.

34.     At all times relevant to the events at issue in this case, Defendant Wexford contracted with the IDOC to provide healthcare to men housed at Pontiac, including Mr. Johnson. As the provider of healthcare services to prisoners incarcerated at Pontiac and other IDOC facilities, Wexford was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to prisoners in IDOC custody.

35.     Prior to the events giving rise to Plaintiff's Second Amended Complaint, Defendant Wexford had notice of widespread policies and practices by healthcare and correctional employees at Pontiac pursuant to which prisoners like Mr. Johnson with serious medical needs were routinely denied medical care and access to medical care. Despite knowledge of these problematic policies and practices, Defendant Wexford did nothing to ensure that prisoners at Pontiac received adequate medical care and access to medical care, thereby acting with deliberate indifference.

8

36. Specifically, there exist widespread policies or practices at Pontiac pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or respond inadequately to prisoners who have requested medical attention or medication, or asked to see a doctor; (2) healthcare personnel commonly fail to respond or respond inadequately to prisoners who exhibit obvious signs of a serious medical condition; (3) healthcare personnel commonly fail to perform adequate examinations of prisoners with serious medical conditions; (4) healthcare personnel with inadequate training, qualifications, and experience are charged with the responsibility of screening and evaluating prisoner complaints and requests for medical care; (5) healthcare personnel fail to provide timely healthcare to prisoners; (6) healthcare personnel fail to respond adequately or timely to diagnostic testing that reveals serious medical needs; (7) healthcare personnel fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; (8) healthcare personnel persist in courses of treatment known to be ineffective; and (9) healthcare personnel make treatment decisions based on cost, even when those decisions are adverse to the patient's health.

37. These widespread policies and practices were allowed to flourish because Defendant Wexford, which directs the provision of healthcare services at Pontiac, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional

employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant Wexford violated Mr. Johnson's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

38. The above-described widespread policies and practices, so well settled as to constitute de facto policy at Pontiac, were able to exist and thrive because Defendant Wexford was deliberately indifferent to the problem, thereby effectively ratifying it.

39. At all times relevant to their involvement in this case, Defendants Tilden, Grennan, and Ritz were responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding medical care at Pontiac; the training of IDOC and Wexford staff at Pontiac on providing medical care to prisoners, and providing prisoners access to medical care; and the supervision of IDOC and Wexford staff at Pontiac who provided medical care and were responsible for providing prisoners access to medical care.

40. Prior to the events giving rise to Plaintiff's Second Amended Complaint, Defendants Tilden, Grennan, and Ritz had notice of widespread policies and practices by healthcare and correctional employees at Pontiac pursuant to which prisoners like Mr. Johnson with serious medical needs were routinely denied medical care and access to medical care. Despite knowledge of these problematic policies and practices, Defendants Tilden, Grennan, and Ritz did nothing to ensure

10

that prisoners at Pontiac received adequate medical care and access to medical care, thereby acting with deliberate indifference.

41.     Specifically, there exist widespread policies or practices at Pontiac pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or respond inadequately to prisoners who have requested medical attention or medication, or asked to see a doctor; (2) healthcare personnel commonly fail to respond or respond inadequately to prisoners who exhibit obvious signs of a serious medical condition; (3) healthcare personnel commonly fail to perform adequate examinations of prisoners with serious medical conditions; (4) healthcare personnel with inadequate training, qualifications, and experience are charged with the responsibility of screening and evaluating prisoner complaints and requests for medical care; (5) healthcare personnel fail to provide timely healthcare to prisoners; (6) healthcare personnel fail to respond adequately or timely to diagnostic testing that reveals serious medical needs; (7) healthcare personnel fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; (8) healthcare personnel persist in courses of treatment known to be ineffective; and (9) healthcare personnel make treatment decisions based on cost, even when those decisions are adverse to the patient's health.

42.     These widespread policies and practices were allowed to flourish because Defendants Tilden, Grennan, and Ritz who oversaw the provision of

healthcare to prisoners at Pontiac, directly encouraged the very type of misconduct at issue in this case. In this way, Defendants Tilden, Grennan, and Ritz violated Mr. Johnson's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

43. The above-described widespread policies and practices, so well settled as to constitute de facto policy at Pontiac, were able to exist and thrive because Defendant Tilden, Grennan, and Ritz were deliberately indifferent to the problem, thereby effectively ratifying it.

44. At all times relevant to his involvement in this case, Defendant Melvin was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding prisoners' access to constitutionally adequate medical care at Pontiac; the training of IDOC staff at Pontiac on providing prisoners access to medical care; and the supervision of IDOC staff at Pontiac.

45. Prior to the events giving rise to Plaintiff's Complaint, Defendant Melvin had notice of widespread policies and practices by healthcare and correctional employees at Pontiac pursuant to which prisoners like Mr. Johnson with serious medical needs were routinely denied medical care and access to medical care. It is common at Pontiac to see prisoners with clear symptoms of serious medical needs who repeatedly request medical evaluation or treatment, and whose requests are routinely delayed or completely ignored by healthcare and correctional employees. Despite knowledge of these problematic policies and practices, Defendant Melvin did nothing to ensure that prisoners at Pontiac

received constitutionally adequate medical care and access to constitutionally adequate medical care, thereby acting with deliberate indifference.

46. Specifically, there exist widespread policies or practices at Pontiac pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or respond inadequately to prisoners who have requested medical attention or medication, or asked to see a doctor; (2) healthcare personnel commonly fail to respond or respond inadequately to prisoners who exhibit obvious signs of a serious medical condition; (3) healthcare personnel commonly fail to perform adequate examinations of prisoners with serious medical conditions; (4) healthcare personnel with inadequate training, qualifications, and experience are charged with the responsibility of screening and evaluating prisoner complaints and requests for medical care; (5) healthcare personnel fail to provide timely healthcare to prisoners; (6) healthcare personnel fail to respond adequately or timely to diagnostic testing that reveals serious medical needs; (7) healthcare personnel fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; (8) healthcare personnel persist in courses of treatment known to be ineffective; and (9) healthcare personnel make treatment decisions based on cost, even when those decisions are adverse to the patient's health.

47. These widespread policies and practices were allowed to flourish because Defendant Melvin, who oversaw healthcare and correctional employees at

Pontiac and was responsible for ensuring that prisoners had access to constitutionally adequate medical care, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant Melvin violated Mr. Johnson's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

48. The above-described widespread policies and practices, so well settled as to constitute de facto policy at Pontiac, were able to exist and thrive because Defendant Melvin was deliberately indifferent to the problem, thereby effectively ratifying it.

49. Mr. Johnson's injuries were caused by employees of IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described in this Count.

## COUNT II
## 42 U.S.C. § 1983 – Conspiracy
## All Defendants

50. Plaintiff incorporates each paragraph of this Second Amended Complaint as if fully restated here.

51. Defendants reached an agreement among themselves to deprive Mr. Johnson of his constitutional rights and to protect one another from liability for

depriving Mr. Johnson of his rights, all as described in the various paragraphs of this Second Amended Complaint.

52.     In furtherance of this conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

53.     The misconduct described in this Count was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Johnson's rights.

54.     As a direct and proximate result of the illicit prior agreement referenced above, Mr. Johnson's rights were violated and he suffered injuries, including pain, suffering, emotional distress, and the loss of his toes.

55.     Mr. Johnson's injuries were caused by employees of the IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

### COUNT III
### 42 U.S.C. § 1983 – Failure to Intervene (Eighth Amendment)
### All Defendants

56.     Plaintiff incorporates each paragraph of this Second Amended Complaint as if fully restated here.

57.     As described more fully above, Defendants had a reasonable opportunity to prevent the violation of Mr. Johnson's constitutional rights as set forth above had they been so inclined, but failed to do so.

58.     Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Mr. Johnson's rights.

59.     As a direct and proximate result of Defendants' misconduct, Mr. Johnson's rights were violated and he suffered injuries, including pain, suffering, emotional distress, and the loss of his toes.

60.     Mr. Johnson's injuries were caused by employees of the IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

## COUNT IV
### Negligent or Willful and Wanton Conduct
### All Defendants

61.     Plaintiff incorporates each paragraph of this Second Amended Complaint as if fully restated here.

62.     In the manner described more fully above, the actions of Defendants Grennan and Melvin breached the duty of care owed to prisoners in their care.

63.     Alternatively, the actions of Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were aware that an injury would probably arise from the above-described course of action and recklessly disregarded the consequences of those actions.

64.     Defendants' actions were undertaken willfully and wantonly, and/or with reckless indifference or conscious disregard for Mr. Johnson's health and safety.

65.     As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Mr. Johnson suffered injuries, including pain, suffering, emotional distress, and the loss of several toes.

## COUNT V
## Respondeat Superior
## Defendant Wexford

66. Plaintiff incorporates each paragraph of this Second Amended Complaint as if fully restated here.

67. On information and belief, in committing the acts alleged in the preceding paragraphs, Defendants Tilden and Ritz were employees, members, and agents of Wexford, acting at all relevant times within the scope of their employment.

68. Consequently, Defendant Wexford is liable for the actions of its employees acting within the scope of their employment under state law.

69. Defendant Wexford, as a private corporation acting under color of state law, should additionally be held liable under 42 U.S.C. § 1983 for the conduct of its employees acting within the scope of their employment. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793–95 (7th Cir. 2014).

## COUNT VI
## Indemnification

70. Plaintiff incorporates each paragraph of this Second Amended Complaint as if fully restates here.

71. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

72. One or more Defendants are or were employees of the IDOC and acted within the scope of their employment in committing the misconduct described above.

73. The State of Illinois is obligated to pay any judgment entered against individual Defendants within the scope of their employment for IDOC.

Wherefore, Plaintiff Barry Johnson respectfully requests that this Court enter a judgment in his favor and against Defendants Wexford Health Sources, Inc., Andrew Tilden, Stephen Ritz, Mary Ellen Grennan, and Michael Melvin, awarding compensatory damages, punitive damages, injunctive relief, attorneys' fees and costs, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Barry Johnson hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil procedure on all issues so triable.

Dated: June 8, 2018

Respectfully submitted,

/s/ Adair R. Crosley
*Attorney for Plaintiff*

Sarah Grady
Adair R. Crosley
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
312-243-5900
adair@loevy.com

## **CERTIFICATE OF SERVICE**

    I, Adair R. Crosley, an attorney, certify that on June 8, 2018, I caused the foregoing Second Amended Complaint to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Adair R. Crosley
*Attorney for Plaintiff*
